UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

No. 13-cv-4202 (RJS)
_____

OMEGA OVERSEAS PARTNERS, LTD., *et al.*,
*derivatively on behalf of Tetragon Financial Group Limited*,

Plaintiffs,

VERSUS

READE GRIFFITH, *et al.*,

Defendants.

_____

OPINION AND ORDER
August 7, 2014
_____

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Omega Overseas Partners, Ltd. ("Omega") and Jeffrey D. Hall ("Hall," and together with Omega, "Plaintiffs") bring this derivative suit on behalf of Tetragon Financial Group Limited ("TFG"), alleging causes of action for rescission of an investment adviser contract under the Investment Advisers Act of 1940 (the "IAA" or the "Act"), Pub. L. No. 76-768, tit. II, 54 Stat. 847 (codified as amended at 15 U.S.C. §§ 80b-1 to -21) and for breaches of fiduciary duty and unjust enrichment under the common law against Defendants Reade Griffith, Patrick Dear, Byron Knief, Greville V.B. Ward, Rupert Dorey, David Jeffreys, Jeff Herlyn, Michael Rosenberg, David Wishnow, Tetragon Financial Management LP ("TFG Investment Manager"), Tetragon Financial Management GP LLC, Polygon Credit Holdings Ltd., Polygon Credit Holdings II Ltd., Polygon Management LP ("Polygon"), Polygon Global Partners LP, and Polygon Global Partners LLP.

Now before the Court is Defendants' motion to dismiss. For the reasons set forth below, the motion is granted because Plaintiffs have failed to state a federal claim and because the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining non-federal claims.

I. BACKGROUND

A. Facts[1]

TFG is a Guernsey-based closed-end investment company[2] (Con. Compl. ¶¶ 3, 17), and TFG Investment Manager is its investment adviser (*id.* ¶ 28). Omega and Hall are shareholders of TFG. (*Id.* ¶ 2.) In 2012, TFG Investment Manager caused TFG to purchase Polygon – a Cayman Islands-based investment adviser owned by TFG's and TFG Investment Manager's principals (*id.* ¶¶ 18, 19, 32) – in exchange for allegedly undervalued TFG shares. (*Id.* ¶¶ 5–6.) Immediately after that purchase, TFG announced a share repurchase, which drove up the price of TFG shares. (*Id.* ¶ 8.) According to Plaintiffs, the purchase of Polygon and the subsequent share repurchase wrongfully diverted tens of millions of dollars from TFG and its public shareholders to the owners of Polygon. (*Id.*)

B. Procedural Background

Omega filed its complaint on June 18, 2013. (Doc. No. 1.) Hall filed his own complaint in a separately docketed case on August 16, 2013. (*Hall v. Griffith, et al.*, 13-cv-5791 (RJS), Doc. No. 1.) On September 4, 2013, the Court consolidated the two cases under this docket number. (Doc. No. 22.) Plaintiffs filed their Consolidated Complaint on September 11, 2013. (Con. Compl.)

After some preliminary motion practice on discovery, Defendants filed their motion to dismiss and their supporting papers on January 13, 2014. (Doc. Nos. 60–69.) Plaintiffs responded on March 14, 2013 (Doc. Nos. 82–86), and Defendants replied on April 11, 2014 (Doc. Nos. 90–95).

On May 8, 2014, the Court ordered the parties to submit supplemental briefing addressing whether the Consolidated Complaint stated a claim under § 215(b) of the IAA, an issue no party had addressed in its briefing. (Doc. No. 97.) The parties submitted their supplemental briefs on May 16, 2014. (Doc. Nos. 98, 99 ("Pl. Supp. Mem.").) The Court held oral argument on the motion on May 23, 2014. (Doc. No. 102.)

II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). To meet this standard, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556

---

[1] Unless otherwise indicated, the following facts are taken from the Consolidated Complaint (Doc. No. 26 ("Con. Compl.")). For the purpose of resolving the motion, Plaintiffs' allegations are assumed to be true and all reasonable inferences are drawn in Plaintiffs' favor. *See Cleveland v. Caplaw Ents.*, 448 F.3d 518, 521 (2d Cir. 2006).

[2] "A closed-end investment company, unlike a traditional open-end mutual fund, has fixed capitalization and may sell only the number of shares of its own stock as originally authorized. It does not redeem its securities at the option of the shareholder. Shares of a closed-end fund are traded on a secondary market; that is, its stock, like that of any publicly owned corporation, is usually listed on a national exchange." *Green v. Nuveen Advisory Corp.*, 295 F.3d 738, 740 n.1 (7th Cir. 2002).

2

U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id*. at 570.

### III. DISCUSSION

The Court addresses the sufficiency of Plaintiffs' federal claim first. After dismissing that claim, the Court turns to the remaining claims and dismisses them as well.

#### A. The Investment Advisers Act

Plaintiffs' single federal claim is brought under the IAA. (Con. Compl. ¶¶ 115–121.) Plaintiffs do not, however, bring a claim under the Act's general antifraud provision, § 206. *See* 15 U.S.C. § 80b-6. Indeed, they could not. The Supreme Court held in *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis* that there is no private right of action available under § 206. 444 U.S. 11, 19–25 (1979). Instead, Plaintiffs bring a claim under § 215(b) of the Act, which provides "a limited private remedy . . . to void an investment advisers contract." *Id.* at 24. Specifically, § 215(b) provides that:

> [e]very contract made in violation of any provision of [the IAA] and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of [the IAA], or any rule, regulation, or order thereunder, shall be void . . . .

15 U.S.C. § 80b-15(b).[3]

In their § 215(b) claim, Plaintiffs seek to void the 2007 investment adviser contract between TFG and TFG Investment Manager and rescind all payments made under the contract. (Con. Compl. ¶¶ 28, 120–121.) They allege that the contract is void because TFG Investment Manager, five years after entering into the contract, violated § 206 by defrauding TFG through designing and implementing the Polygon transaction and the subsequent share repurchase. (Con. Compl. at ¶ 119.) That subsequent fraud,

---

[3] The full text of § 215 reads:

**§ 80b-15. Validity of contracts**

**(a) Waiver of compliance as void**

Any condition, stipulation, or provision binding any person to waive compliance with any provision of this subchapter or with any rule, regulation, or order thereunder shall be void.

**(b) Rights affected by invalidity**

Every contract made in violation of any provision of this subchapter and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this subchapter, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

3

they argue, caused "the performance of [the contract] [to] involve[] the violation of [the IAA]," 15 U.S.C. § 80b-15(b), thus triggering § 215. In other words, Plaintiffs proceed on the theory that § 215(b) voids an investment adviser contract anytime an investment adviser defrauds a client in violation of the IAA. More bluntly, Plaintiffs effectively claim that § 215 is a backdoor to the private right of action that the Supreme Court refused to find under § 206.

As explained below, the Court holds that the provision is significantly narrower than Plaintiffs contend. Put simply, § 215(b) is merely a codification of the common-law principle that illegal contracts are invalid. As such, § 215(b) voids a contract only where the contract would be invalid under that principle – that is, where the contract was made illegally or requires illegal performance. Therefore, because Plaintiffs have not alleged that the contract was made illegally or requires illegal performance, they have failed to state a claim under § 215(b).

1. Section 215(b) Codifies the Principle that Illegal Contracts Are Invalid

Unlike § 206, which prohibits investment advisers from, among other things, "employ[ing] any device, scheme, or artifice to defraud any client or prospective client," 15 U.S.C. § 80b-6(1), § 215(b) is not a general antifraud provision. Instead, both § 215's title and § 215(b)'s text demonstrate that § 215(b) was meant to codify the more modest principle that illegal contracts are invalid.

First, the title – "Validity of contracts" – indicates that § 215 targets problems in the formation of contracts and in the contents of contracts, and not the actions taken pursuant to contracts. *See Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d 144, 169 (2d Cir. 2013) ("The title of a statute and the headings of its sections are tools available for the resolution of a doubt about the meaning of a statute." (alterations and internal quotation marks omitted)); *cf. Restatement of Contracts* § 4 cmt. a (1932) (providing examples affecting contract validity, including contract illegality and insufficient consideration); *Restatement of Conflict of Laws* § 332 (1934) (listing issues affecting a contract's validity, none of which relate to subsequent conduct).

Second, § 215(b)'s text strongly echoes the description of illegal contracts found in the *Restatement of Contracts*, which was published only a few years before the IAA's enactment. For example, like the *Restatement*, § 215(b) addresses contracts made in violation of the law and contracts whose performance involves a violation of the law. *Compare* 15 U.S.C. § 80b-15(b) (voiding contracts "made in violation of any provision of [the IAA]" and contracts whose "performance . . . involves the violation of [the IAA]"), *with Restatement of Contracts* § 512 ("A bargain is illegal . . . if either its formation or its performance is criminal, tortious, or otherwise opposed to public policy."). Similarly, § 215(b) – like the principle described in the *Restatement* – does not void a contract entirely, but voids only the rights of a party who is blameworthy. *Compare* 15 U.S.C. § 80b-15(b)(1)–(2) (voiding a contract only as to the rights of those who (1) "in violation of [the IAA], shall have made or engaged in the performance of any such contract," or (2) have acquired rights under the contract "with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of [the IAA]"), *with Restatement of Contracts* § 604 (stating that a party to an illegal bargain who is "not in pari delicto . . . can repudiate the bargain, and if he has rendered any

performance thereunder, recover it or its value").

Because § 215(b) codifies a pre-existing common-law principle, it should be read consistently with that principle. *See Empire HealthChoice Assur., Inc. v. McVeigh*, 396 F.3d 136, 152 (2d Cir. 2005) ("Congress is understood to legislate against the pre-existing backdrop of the common law."), *aff'd*, 547 U.S. 677 (2006). Thus, under § 215(b), as under the common law, "if an agreement can by its terms be performed lawfully, it will be treated as legal, even if performed in an illegal manner." 12 *Am. Jur.* § 153 (1938); *accord Cochran v. Burdick*, 70 F.2d 754, 756 (D.C. Cir. 1934). Or, in the words of then-state-court-Justice Holmes, "If the contract was legal, it would not be made illegal by misconduct on the part of [a party] in carrying it out." *Barry v. Capen*, 23 N.E. 735, 735 (Mass. 1890). Consequently, a contract does not become void under § 215(b) merely because an investment adviser defrauded her or his client – rather, a contract is void only if it was made illegally or requires illegal performance.

Indeed, a long line of cases have similarly interpreted § 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78cc(b), which tracks § 215(b) nearly word for word.[4] *See, e.g.*, *Frati v. Saltzstein*, No. 10-cv-3255 (PAC), 2011 WL 1002417, at *6 (S.D.N.Y. Mar. 14, 2011) (holding that a contract cannot be rescinded if the contract could legally be performed); *Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676, 682 (S.D.N.Y. 1984) (holding that § 29(b) voids contracts that "in their inception or as performed are, or become, *inherently* violative of the Act or regulations thereunder"); *Drasner v. Thomson McKinnon Sec., Inc.*, 433 F. Supp. 485, 501–02 (S.D.N.Y. 1977) (holding that only "contracts which by their terms violate the" statute are void). According to Judge Weinfeld, for instance, § 29(b) addresses "unlawful contracts" and "not unlawful transactions made pursuant to lawful contracts." *Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y.), *aff'd*, 672 F.2d 901 (2d Cir. 1981). Therefore, § 29(b) was inapplicable in a case where "[t]here [was] no suggestion that the basic customer agreement plaintiff signed [was] not lawful." *Id.* Similarly, Judge Friendly noted that § 29(b) "was a legislative direction to apply common-law principles of illegal bargain, enacted at a time when it seemed much more likely than it might now that courts would fail to do this without explicit legislative instruction." *Pearlstein v. Scudder & German*, 429 F.2d 1136, 1149 (2d Cir. 1970) (Friendly, J., dissenting, on an issue the majority opinion did not reach). As such, a contract would not be void under § 29(b) where "the contract was not in violation of any provision of the statute or any rule or regulation; its performance would not have involved any violation if [the plaintiff] had done as he was obligated; and the court [was not] asked to enforce anything that constitutes a violation." *Id.* In addition, the Third and Fourth Circuits have reached the same conclusion. *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 206 (3d Cir. 2006) (holding that a contract can be voided under § 29(b) only where the "agreement cannot be performed without

---

[4] The relevant text of § 29(b) states:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void . . . .

5

violating the securities laws"); *Occidental Life Ins. Co. of N. Carolina v. Pat Ryan & Associates, Inc.*, 496 F.2d 1255, 1266 (4th Cir. 1974) ("Section 29(b) merely makes explicit that which is implicit, i.e., the recognition of the doctrine of illegal bargains in the application of the securities laws.").[5] Given the identical language in § 215(b) and § 29(b) and the close relationship between the IAA and the Exchange Act – both in terms of their dates of passage and their purposes, *see SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186–87 (1963) (describing the IAA and the Exchange Act as part of a series of statutes sharing a "common," "fundamental purpose") – that case law is highly persuasive here. *See Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005) (plurality opinion) ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.").

Accordingly, the Court finds that § 215(b) – like § 29(b) – voids only contracts that are made illegally or require illegal performance.

### 2. Plaintiffs' Arguments to the Contrary

Plaintiffs make four arguments against this narrower interpretation. First, they argue that § 29(b) and § 215(b) have different purposes and therefore should be interpreted differently notwithstanding their identical language. Second, they argue that the Supreme Court's opinion in *TAMA* supports their broader interpretation of § 215(b). Third, they argue that precedent in this district supports a broader interpretation of § 215(b). And fourth, they argue that a broader interpretation of § 215(b) is necessary to effectively implement the IAA. The Court ultimately finds none of those arguments persuasive.

#### a. § 29(b) and § 215(b) Should Not Be Interpreted Differently

Plaintiffs argue that § 215 and § 29 should be interpreted differently in light of the different purposes behind the IAA and the Exchange Act. (Pl. Supp. Mem. at 1–2.) That argument, however, misunderstands the relationship between the IAA and the Exchange Act and between § 215(b) and § 29(b).

Plaintiffs are correct that identical words or phrases used in different statutes, or even in the same statute, can have different meanings when the provisions have different purposes and contexts. *See United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 213 (2001) ("[T]he presumption [that identical words have the same meaning] is not rigid, and the meaning of the same words well may vary to meet the purposes of the law." (alterations and internal quotation marks omitted)). But the Supreme Court has interpreted similarly worded provisions in two statutes differently only where differing statutory contexts undermined any fair comparison between the statutes. *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 522–

---

[5] To be sure, the Fifth Circuit has rejected a requirement that the contract be illegal "by (its own) terms." *Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 560 (5th Cir. 1982). Nevertheless, the broker-dealer contract at issue in that case could not have been legally performed because the broker-dealer had never registered with the SEC. *Id.* at 556. The Fifth Circuit's opinion therefore is hardly inconsistent with the precedent just discussed and stands only for the reasonable proposition that the circumstances surrounding a contract's performance can make the performance required illegal even if the contract's terms are themselves innocuous. *See GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 201 (3d Cir. 2001) (interpreting *Regional Properties* as consistent with Southern District of New York precedent).

6

25 (1994) (rejecting a comparison between a fee-shifting provision in the Copyright Act and a fee-shifting provision in the Civil Rights Act). Where two statutes operate in the same area of the law, on the other hand, the general rule remains that similar language should be interpreted similarly. *See Smith*, 544 U.S. at 233–34 (plurality opinion) (holding that nearly identical language in two anti-discrimination statutes should be interpreted identically); *Wasser v. N.Y. State Office of Vocational & Educ. Servs. for Individuals with Disabilities*, 602 F.3d 476, 479 (2d Cir. 2010) (holding that nearly identical language in two statutes designed to "assist individuals with disabilities" should be interpreted identically).

Here, both the Exchange Act and the IAA are among the "series of [securities] Acts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's." *Capital Gains*, 375 U.S. at 186. Both share a "common," "fundamental purpose" of requiring disclosure in the securities industry. *Id.* at 186–87. The statutes were passed within six years of each other, and Congress drew on the country's experience with the other securities laws when drafting the IAA. *See id.* at 197–99 (holding that Congress adapted the language of the IAA to fit precedent interpreting the Securities Act of 1933). Indeed, the Supreme Court has referred to § 215(b) and § 29(b) as "counterparts" of each other, *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 387 & n.10 (1970), and has cited case law analyzing one provision when interpreting the other, *see TAMA*, 444 U.S. at 18–19 (stating that § 29 of the Exchange Act and § 215 of the IAA are "comparable provision[s]"); *Mills*, 396 U.S. at 387. And the Second Circuit has applied § 29(b)'s statute of limitations to § 215(b) because "it reflects the accepted balancing of the same interests." *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1039 (2d Cir. 1992). Neither the Supreme Court nor any court in the Second Circuit has ever implied that the two provisions have different purposes or meanings.

Legislative history also supports interpreting § 215(b) and § 29(b) identically. That history shows that § 215(b) was copied whole-cloth from § 29(b) and was viewed merely as securities law boilerplate. Of the six securities acts passed between 1933 and 1940, four included the same language found in § 29 and § 215.[6] In each case, the provision had the same title, "Validity of contracts." Likely because such provisions were so common, § 215 received little comment in the IAA's legislative history. Indeed, the legislative reports on the IAA and the Investment Company Act of 1940 (the "ICA") – the IAA's companion statute – refer to this language simply as "the usual provision[] regarding the validity of contracts." S. Rep. No. 76-1775, at 20, 23 (1940) (report of the S. Comm. on Banking and Currency); *accord* H.R. Rep. No. 76-2639, at 27, 30 (1940) (report of the H.

---

[6] *See* IAA, Pub. L. No. 76-768, tit. II, § 215, 54 Stat. 847, 856–57 (codified as amended at 15 U.S.C. § 80b-15); Investment Company Act of 1940, Pub. L. No. 76-768, tit. I, § 47, 54 Stat. 789, 845–46 (codified as amended at 15 U.S.C. § 80a-46); Public Holding Company Act of 1935, Pub. L. No. 74-333, tit. I, § 26, 49 Stat. 803, 835–36 (repealed 2005); Securities Exchange Act of 1934, Pub. L. No. 73-291, tit. I, § 29, 48 Stat. 881, 903–04 (codified as amended at 15 U.S.C. § 78cc). Several of these provisions have subsequently been amended and their texts are no longer as close to § 215 as they originally were. The two securities statutes that do not include the language found in § 215(b) nevertheless include a provision incorporating the language of § 215(a). *See* Trust Indenture Act of 1939, Pub. L. No. 76-253, tit. III, § 327, 53 Stat. 1149, 1177 (codified at 15 U.S.C. § 77aaaa); Securities Act of 1933, Pub. L. No. 73-22, tit. I, § 14, 48 Stat. 74, 84 (codified at 15 U.S.C. § 77n).

Comm. on Interstate and Foreign Commerce). Nothing indicates that Congress intended § 215(b) to be any different from its counterparts. *See Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 756 (1979) (holding that where (1) a provision is copied from one statute to another, and (2) the two statutes "share a common purpose," the two provisions should have the same meaning).

Finally, it bears repeating that § 215(b) and § 29(b) are not merely similarly worded and do not merely share a few terms or phrases. The relevant portions of the provisions are nearly word-for-word identical. Because a court's statutory interpretation "inquiry begins with the statutory text, and ends there as well if the text is unambiguous," *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004), any space between the interpretations of these two identical, unambiguous provisions is simply untenable, *see Komanoff v. Mabon, Nugent & Co.*, 884 F. Supp. 848, 857 (S.D.N.Y. 1995) ("It is clear from this statutory language that, under Section 29(b), 'only unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts.'" (quoting Judge Weinfeld in *Zerman*, 510 F. Supp. at 135)).

Plaintiffs cite only one case that has even suggested that § 215(b) should be interpreted differently from § 29(b). *See In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 873 (D. Md. 2005). That opinion, which the authoring court itself recognized was advisory only, *id.* at 874–875, stated that interpreting § 215 identically to its counterpart in the ICA, § 47, "may be too superficial an approach," *id.* at 882. Nevertheless, in light of the other grounds for dismissal in that case, the court declined to resolve the issue. *Id.* As such, even Plaintiffs' best case offers them little support.

Given the Exchange Act's and the IAA's common history, purpose, and legal domain; the precedent interpreting the two provisions together; the fact that § 215 was copied from § 29 and other provisions in related statutes; and the textual identity between the provisions, the Court sees no reason to interpret the two provisions differently.

b. *TAMA* Does Not Support a Broader Reading of § 215

In *TAMA*, the Supreme Court recognized that private parties can sue to void a contract under § 215(b). *TAMA*, 444 U.S. at 17–19. Plaintiffs claim that the Supreme Court in *TAMA* must have shared Plaintiffs' understanding of § 215(b)'s meaning because the respondent in *TAMA* sought rescission of his investment adviser agreement based on allegations that the petitioner had violated § 206 by engaging in "misconduct in the course of performance . . . related to: (i) 'grossly excessive compensation'; (ii) the purchase of securities of 'inferior quality'; and (iii) the misappropriation of investment opportunities." (Pl. Supp. Mem. at 6 (quoting *TAMA*, 444 U.S. at 13–14).) Unfortunately, Plaintiffs' characterization of *TAMA*'s facts is inaccurate.

According to the Supreme Court, the respondent in *TAMA* "alleged that the advisory contract between TAMA and the Trust was unlawful because TAMA and Transamerica were not registered under the Act and because the contract had provided for grossly excessive compensation." *TAMA*, 444 U.S. at 13. In other words, the respondent in *TAMA* alleged that the contract should be voided because the contract itself included illegally excessive compensation terms and illegally required an unregistered entity to act as an

investment adviser.[7] Those allegations are perfect examples of what the Court holds § 215(b) requires.

Hence, *TAMA* offers Plaintiffs no support. In fact, to the extent *TAMA* sheds any light on the circumstances under which a contract may be voided, it favors the narrower interpretation. *TAMA* described § 215(b) as voiding "contracts whose formation or performance *would violate* the Act." *TAMA*, 444 U.S. at 16–17 (emphases added). The strongest reading of that statement is that the Supreme Court in *TAMA* understood § 215(b) to apply to contracts that are made illegally or require illegal performance.

### c. Precedent in this District Does Not Support Plaintiffs' Reading

Several cases in this district have addressed claims brought under § 215(b), and Plaintiffs assert that many of them support their interpretation that § 215(b) voids an investment adviser contract whenever an investment adviser defrauds her or his client. The Court, however, determines that all but one of those cases does not address the issue at all, and that the one case that does is unpersuasive.

Plaintiffs cite the following cases as supportive of their broader interpretation: *GPIF-I Equity Co., Ltd. v. HDG Mansur Investment Services, Inc.*, No. 13-cv-547 (CM), 2014 WL 1612004 (S.D.N.Y. Apr. 21, 2014); *In re Beacon Associates Litigation*, 745 F. Supp. 2d 386 (S.D.N.Y. 2010); *In re Evergreen Mutual Funds Fee Litigation*, 423 F. Supp. 2d 249 (S.D.N.Y. 2006); *Clark v. Nevis Capital Management, LLC*, No. 04-cv-2702 (RWS), 2005 WL 488641 (S.D.N.Y. Mar. 2, 2005); *Norman v. Salomon Smith Barney, Inc.*, 350 F. Supp. 2d 382 (S.D.N.Y. 2004); and *Wellington International Commerce Corp. v. Retelny*, 727 F. Supp. 843 (S.D.N.Y. 1989). (Pl. Supp. Mem. at 4–6.) In reality, however, with the exception of *In re Evergreen*, none of those cases addresses this issue at all. Although several of those cases allowed § 215(b) claims to proceed, those cases did not discuss or explicitly rule on whether § 215(b) voids an investment adviser contract because of subsequent misconduct by the investment adviser. That is unsurprising, as courts normally address only the arguments parties make, and the parties in those cases (except in *In re Evergreen*) did not raise the issue in their briefing.[8] Therefore, those decisions would have relevance here only if one assumes that those courts went out of their way to consider the issue and then silently decided it. The Court is unwilling to make that leap. Consequently, those cases cannot be read as persuasive authority on the meaning of § 215(b).[9]

As for *In re Evergreen*, the district court there did address the issue and did endorse Plaintiffs' interpretation of § 215(b). Nevertheless, the court in that case provided

---

[7] In the underlying Complaint in *TAMA*, the only claims relating to § 215(b) alleged that the contract was "unlawful pursuant to . . . § 215(b) of the Advisers Act because neither Transamerica nor Mortgage Advisors has ever been registered as an investment adviser under the Advisers Act." (Complaint, Joint Appendix, *TAMA*, 444 U.S. 11 (No. 77-1645), 1979 U.S. S. Ct. Briefs LEXIS 1082, at *12, *21–22 (citation omitted).)

[8] The Court has reviewed the briefing in all of the cases except for *Wellington International Commerce Corp. v. Retelny*. Because of that case's age, those filings are no longer available from the Clerk of the Court.

[9] *Norman*, to the extent it has any bearing on the issue at all, supports the narrower interpretation of § 215(b). *Norman* explicitly analogized voidness under § 215(b) to voidness for illegality and interpreted the provision in light of "well-established principles of contract law." 350 F. Supp. 2d at 389.

no analysis other than to say that "[c]ourts in this Circuit have routinely permitted Section 215 claims to proceed irrespective of whether the contracts themselves violated the IAA." *In re Evergreen*, 423 F. Supp. 2d at 262 (citing *Clark*, 2005 WL 488641, and *Norman*, 350 F. Supp. 2d 382). As just discussed, the Court does not believe that the decisions allowing claims to proceed offer any guidance on how those courts would have addressed this issue. In any event, *In re Evergreen*'s statement was dicta, as the court dismissed the § 215(b) claim on other grounds. *Id.* at 263, 265. In light of all the arguments discussed above and the minimal analysis on this issue in *In re Evergreen*, the Court does not find that dicta compelling. As such, the Court finds no persuasive authority for Plaintiffs' interpretation.

d. A Broader Interpretation of § 215(b) Is Not Necessary To Effectively Implement the IAA

According to Plaintiffs, a holding that parties cannot sue under § 215(b) to remedy fraudulent performance by investment advisers "would gut the statute and thoroughly frustrate its [reason for existence]." (Pl. Supp. Mem. at 8–9.) That claim is unpersuasive for two reasons.

First, Plaintiffs' claim is untrue. The IAA was intended "to impose enforceable fiduciary obligations [on investment advisers]." *TAMA*, 444 U.S. at 17. That purpose does not require that a private right of action exist for Plaintiffs' claims. As the Supreme Court stated in *TAMA*, "[W]hether Congress intended additionally that [the IAA] would be enforced through private litigation is a different question." *Id.* at 18. In fact, the IAA provides for both civil enforcement by the Securities and Exchange Commission (the "SEC") and criminal enforcement by the Department of Justice. *Id.* at 20. Hence, the statute's purpose can be achieved without any private suits, let alone suits to rescind contracts based on subsequent illegal performance.[10]

Second, Plaintiffs' claim is irrelevant. The availability of a private right of action is entirely a question of statutory construction. *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("[Unless the statute itself creates a private right of action], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."). For the reasons discussed above, text and precedent demonstrate that § 215(b) does not void contracts unless they are made illegally or require illegal performance. *See TAMA*, 444 U.S. at 23 ("The dispositive question remains whether [the statutory text and legislative history show that] Congress intended to create any such remedy. Having answered that question in the negative, our inquiry is at an end."). Thus, to the extent that allowing a client to rescind a contract based on subsequent illegal performance

---

[10] It bears noting that, in most cases where an investment adviser defrauds a client, the client will have a claim under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. *See* 7 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 21.4 (2014) (noting that the availability of private suits under Rule 10b-5 makes up for the lack of a private right of action under the IAA). Such claims are not available, however, in cases like this one, which involve extraterritorial transactions in foreign securities. *See Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 273 (2010) (limiting liability under § 10(b) to fraud "in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States"); *see also SEC v. Amerindo Inv. Advisors, Inc.*, No. 05-cv-5231 (RJS), 2013 WL 1385013, at *9 n.10 (S.D.N.Y. Mar. 11, 2013) (holding that *Morrison* does not apply to the IAA), *modified on other grounds*, 05-cv-5231 (RJS), 2014 WL 405339 (S.D.N.Y. Feb. 3, 2014).

would better serve the IAA's purpose than the statute as written, that argument is properly addressed to Congress, not the Court.

Indeed, a purpose-based argument similar to Plaintiffs' was made by the dissenting Justices in *TAMA*:

> Implication of a private right of action for damages unquestionably would be not only consistent with the legislative goal of preventing fraudulent practices by investment advisers, but also essential to its achievement. While the Act empowers the SEC to take action to seek equitable relief to prevent offending investment advisers from engaging in future violations, in the absence of a private right of action for damages, victimized clients have little hope of obtaining redress for their injuries.

*TAMA*, 444 U.S. at 34 (White, J., dissenting) (footnote omitted). Just as that argument was rejected in *TAMA*, it must be rejected here.

\*   \*   \*

In sum, the Court holds that the § 215(b) voids only contracts that are made illegally or that require illegal performance. Plaintiffs have not alleged that the investment adviser contract between TFG and TFG Investment Manager suffers either of those flaws. As a result, Plaintiffs have failed to state a claim under § 215(b) and their claim must be dismissed.

### B. Remaining Claims

Plaintiffs' remaining claims are non-federal claims brought under the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367. "In general, where the federal claims are dismissed before trial, the [non-federal] claims [brought pursuant to § 1367] should be dismissed as well." *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998). Dismissal is especially appropriate where, as here, the non-federal claims turn on "unsettled" issues of non-federal law. *See Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 306 (2d Cir. 2003); (*see also* Decl. of Andrew Douglas Laws in Opp'n to the Mot. to Dismiss, dated Mar. 12, 2014, Doc. No. 84, ¶¶ 8–9 (noting the lack of Guernsey authority on the issue of who has standing to bring a derivative action).) The Court therefore dismisses Plaintiffs' non-federal claims.

### IV. CONCLUSION

For the reasons stated above, Plaintiffs have failed to state a claim under the IAA. Accordingly, IT IS HEREBY ORDERED THAT Defendants' motion to dismiss Plaintiffs' federal claim is GRANTED. IT IS FURTHER ORDERED THAT all of Plaintiffs' non-federal claims are dismissed for lack of jurisdiction. The Clerk of the Court is respectfully directed to terminate all motions and close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: August 7, 2014
       New York, New York

\*   \*   \*

Plaintiffs are represented by A. Rick Atwood, Jr., Brian E. Cochran, Darren J. Robbins, David T. Wissbroecker, Mark Samuel Reich, Randall J. Baron, and Samuel

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/7/2014

Howard Rudman of Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, California 92101 and 58 South Service Road, Suite 200, Melville, New York 11747.

Defendants Reade Griffith, Patrick Dear, Tetragon Financial Management LP, Tetragon Financial Management GP LLC, Polygon Credit Holdings Ltd., and Polygon Credit Holdings II Ltd. are represented by Herbert M. Wachtell and Bradley Reid Wilson of Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York 10019.

Defendants Byron Knief, Greville V.B. Ward, Rupert Dorey, and David Jeffreys are represented by Joseph Michael McLaughlin and Noah Maxim Leibowitz of Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017.

Defendants Jeff Herlyn, Michael Rosenberg, and David Wishnow are represented by Israel David of Fried, Frank, Harris, Shriver & Jacobson, One New York Plaza, New York, New York 10004.

Nominal Defendant Tetragon Financial Group Limited is represented by Karin A. DeMasi of Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, New York 10019.